**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| HENRY GILMER, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09CV00247 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

Plaintiff Henry Gilmer brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income ["SSI"] and Disability Insurance Benefits ["DIB"].  This Court has jurisdiction to review the administrative denial of his applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record, and the record as a whole.

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks reversal of the administrative denials of his applications and a judicial award of benefits, or at a minimum, a remand of this case to the Social Security Administration to correct certain alleged errors.  The Commissioner seeks an Order affirming the administrative decision.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed his SSI and DIB applications in June 2004, asserting that he was under a "disability" due to increased symptoms of hepatis C, high blood pressure, Chronic Obstructive Pulmonary Disease ["COPD"], congestive heart failure, back pain, arthritis, stomach problems, sleep disorder, depression and bone deterioration.  (Tr. 71-76, 669-73, 117).  He asserted in his applications that his disability precluded him from employment beginning October 30, 2005.

Following initial administrative denials of his applications, Plaintiff received a hearing before Administrative Law Judge ["ALJ"] Thomas R. McNichols, II.  ALJ McNichols later issued a written decision concluding that Plaintiff was not under a disability and therefore not eligible to receive DIB or SSI.  (Tr. 17-29).  ALJ McNichols' decision is at issue in the present case.

### B.    Plaintiff's Vocational Profile

Plaintiff was 61 years old on the date the ALJ issued his decision, defining him as "closely approaching retirement age."  *See* 20 C.F.R. §§ 404.1563(e);

2

416.963(e);[2] (*see also* Tr. 71).  Plaintiff has an eleventh grade, limited education. *See* 20 C.F.R. § 416.964(b)(3); (*see also* Tr. 128).  He has past relevant employment as a kitchen helper/dishwasher.  (Tr. 93-94).

At the administrative hearing, Plaintiff was using portable oxygen and stated that his doctor had prescribed it.  (Tr. 699).  He indicated he needed the oxygen when it was cold outside.  (*Id.*).  He used inhalers, which he testified helped, and also used a breathing machine at night.  (Tr. 699-700).  Plaintiff testified that his shortness of breath kept him from walking very far.  (Tr. 699).  He testified that if he tried to walk one-half block, he would have to stop and use his inhaler.  (*Id.*).

Plaintiff estimated that he could stand for 15 or 20 minutes at a time before becoming short of breath.  (Tr. 708-09).  Plaintiff also estimated that he could lift about 15 or 20 pounds, and said he could climb stairs using a rail.  (Tr. 709).  He washed his clothes and sometimes cooked, but did not clean his living quarters; he said that although he could clean, that was taken care of for him where he lived.  (Tr. 710).  He did not visit any relatives, but had traveled by airplane to California in 2007 for the funerals of family members.  (Tr. 711-13).  Plaintiff testified that he used to smoke three packs of cigarettes a day, but was down to

---

[2]The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

one-half cigarette a day at the time of the hearing. (Tr. 700). He said that he found it difficult to quit smoking completely. (*Id*.).

C.    **Medical Opinions**

In his Statement of Errors, Plaintiff does not challenge the ALJ's findings with respect to his alleged mental impairments. (*See* Doc. # 7). Accordingly, the Court's review of the medical evidence will focus on Plaintiff's alleged exertional impairments.

Dori R. Thompson, M.D.  Plaintiff treated at the Good Samaritan Hospital - Homeless Clinic from December 2003 to September 2005. (Tr. 434-75). His treating physician, Dr. Thompson, noted that Plaintiff had wheezing and coughing with forced expiration on examination in July 2004. (Tr. 448). Dr. Thompson initially diagnosed asthma and prescribed Albuterol. (*Id*.). She diagnosed COPD in August 2004. (Tr. 448). Plaintiff still was smoking one and one-half to two packs of cigarettes per day. (*Id*.). Dr. Thompson treated Plaintiff on four more occasions related to his COPD symptoms. (Tr. 436, 438, 443, 446).

In April 2005, Dr. Thompson completed a Basic Medical form for Montgomery County Jobs and Family Services. Dr. Thompson did not complete the physician examination portion of the report. However, she noted that due to Plaintiff's COPD, he became short of breath quickly. Dr. Thompson also

4

characterized Plaintiff's prognosis as improving with treatment. Dr. Thompson opined that Plaintiff could stand/walk for only one to two hours without interruption in an eight-hour work day. She also opined that Plaintiff could frequently lift and/or carry 11-20 pounds. Dr. Thompson noted that Plaintiff was markedly limited in his ability to push/pull and moderately limited in other postures. She concluded that Plaintiff was "unemployable." (Tr. 407-08).

In August 2005, Plaintiff reported to Dr. Thompson that he was having increasing shortness of breath, despite using his medications. Dr. Thompson recommended a chest x-ray. (Tr. 436). The chest x-ray showed overinflated lungs due to COPD with probable scattered fibrotic changes. (Tr. 461).

Pulmonary Function Study  On February 21, 2006, Plaintiff underwent a pulmonary function study ordered by his treating physician at the Cassano Health Clinic. (Tr. 504-09). Plaintiff's FEV1 (forced expiratory volume at one second) was 1.58 pre-bronchodilator and 1.48 post-bronchodilator. His pre-bronchodilator forced vital capacity ["FVC"] was 3.16 liters, and 3.36 liters post-bronchodilator. His diffusing capacity of the lungs for carbon monoxide ["DLCO"] was measured at 6.6 mL/mmHg/min, or 18 percent of the predicted normal value. The administering physician noted that the decreased post-bronchodilator result "most probably reflect[ed] diminished patient effort

5

although a paradoxical response to Albuterol cannot entirely be ruled out." (Tr. 504).  The DLCO results, the physician commented that "[i]t should be noted that the patient was able to perform only one out of three diffusing capacity maneuvers in an effective fashion[, and] as such[,] that the data at this time cannot be fully validated." (*Id.*).  The physician concluded that the data "suggest[ed] the presence of a severe degree of chronic obstructive pulmonary disease with associated pulmonary overinflation and depressed diffusing capacity suggesting the presence of pulmonary emphysema." (*Id.*).  No significant response to a bronchodilator was demonstrated. (*Id.*).

William D. Padamadan, M.D.  Plaintiff was examined by Dr. Padamadan on October 14, 2004, at the request of the Ohio Bureau of Disability Determination. (Tr. 375-400).  Upon examination, Plaintiff had no chest wall abnormalities, with good movements with respirations.  He also had normal lung sounds, with no wheezes or crackles, and no hyper-resonance of emphysema or dullness of effusions.  "Based upon this clinical evaluation, in the absence of objective findings of any functional impairment," Dr. Padamadan "d[id] not see any indication for limitation of physical activities." (Tr. 378-79).  Dr. Padamadan also noted that "[n]one of the hospital reports substantiating congestive heart failure or COPD were available." (Tr. 379).

6

<u>Anton Freihofner, M.D./Augusto Pangalangan, M.D.</u>  In November 2004, a record reviewing physician, Dr. Freihofner, found that Plaintiff could lift and/or carry and push and/or pull up to 50 pounds occasionally and up to 25 pounds frequently; could stand and/or walk about six hours in an eight-hour work day; could sit about six hours in an eight-hour workday; and should avoid concentrated exposure to extreme heat or cold.  (Tr. 410-17).  He also would need to avoid even moderate exposure to fumes, odors, dusts or gases.  Dr. Freihofner noted that Plaintiff appeared to have "suboptimal cooperation" during his recent examination, suggesting that he was only "partly credible."  (Tr. 415).  In June 2005, record reviewing physician Dr. Pangalangan affirmed Dr. Freihofner's assessment.  (Tr. 417).

## III. ADMINISTRATIVE REVIEW

### A. "Disability" Defined

To be eligible for SSI or DIB, a claimant must be under a "disability" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d); 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in

"substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

**B.    ALJ McNichols' Decision**

ALJ McNichols resolved Plaintiff's disability claim through the required five-Step sequential evaluation procedure.  (Tr. 18-19); *see* 20 C.F.R. § 416.920(a)(4).  He first concluded that Plaintiff met the insured status through December 31, 2008.  (Tr. 21).  He concluded at Step 2 that Plaintiff had the severe impairments of residuals of a gunshot wound to the left shoulder, chronic obstructive pulmonary disease, depression with a history of a substance-induced mood disorder, and a history of opioid dependence, in reported remission.  (*Id*.).  The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*Id*.).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity to perform medium work,[3] but was precluded from performing work above shoulder level with his left upper extremity; from climbing ladders, ropes, and scaffolds; and from otherwise working around hazards.  He also was precluded from working in environments where he would be exposed to temperature extremes, excess humidity or pulmonary irritants.  (Tr. 21).  Mentally, his job should consist of tasks that would not require him to maintain concentration on a single task for more than 15 minutes at a time.  (*Id*.).  The ALJ also found at Step 4 that Plaintiff was unable to perform his past relevant work.  (Tr. 27).

At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (*Id*.).  The ALJ's findings throughout his sequential evaluation ultimately led him to conclude that Plaintiff was not under a disability and therefore was not eligible for DIB or SSI.  (Tr. 17-29).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ

---

[3]The Regulations define medium work as involving the ability to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds . . ."  20 C.F.R. § 416.967(c).

are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6ᵗʰ Cir. 2004)).

## V. DISCUSSION

### A. The Plaintiff's Contentions

Plaintiff contends that the ALJ erred in failing to find that Plaintiff met Listing 3.02 for chronic obstructive pulmonary disease, because the pulmonary function study on February 21, 2006 showed that his FEV1 was 1.58 pre-bronchodilator and 1.48 post-bronchodilator.  In addition, Plaintiff contends that he meets that Listing because his diffusion capacity as measured by the DLCO was 6.5, or only 18 percent of the predicted value.  (Doc. #7 at 8).  Plaintiff further reasons that even if his condition did not meet a listed impairment, he is more limited than found by the ALJ.  (*Id*. at 10).  Plaintiff also contends that the ALJ erred in analyzing the opinion of his treating physician, Dr. Thompson. According to Plaintiff, Dr. Thompson describes him as being able to perform a limited range of light work.  (*Id*.).

The Commissioner argues that ALJ McNichols reasonably found that Plaintiff's COPD did not meet or equal any listing.  (Doc. # 10 at 6).  The Commissioner contents that Plaintiff ignores key aspects of the "specific findings"— namely, that they could not reasonably be relied upon as evidence regarding the state of Plaintiff's COPD.  (*Id.* at 7).  According to the

Commissioner, ALJ McNichols had and gave good reasons for discounting Dr.
Thompson's opinion in determining Plaintiff's residual functional capacity.  (*Id.*
at 8-10).

### B.    Medical Source Opinions

#### 1.    *Treating Medical Sources*

The treating physician rule, when applicable, requires an ALJ to place
controlling weight on a treating physician's or psychologist's opinion, rather
than favoring the opinion of a nonexamining medical advisor or one-time
examining physician or psychologist, or a medical advisor who testified before
the ALJ.  *See Blakley,* 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  A treating
physician's opinion is given controlling weight only if it is both well supported
by medically acceptable data and not inconsistent with other substantial
evidence of record.  *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the
ALJ must still determine how much weight is appropriate by considering a
number of factors, including the length of the treatment relationship and the
frequency of the examination, the nature and extent of the treatment
relationship, supportability of the opinion, consistency of the opinion with the
record as a whole, and any specialization of the treating physician." *Blakley,* 581

F.3d at 406 (citing *Wilson*, 378 F.3d at 544).  More weight generally is given to the opinions of examining medical sources than to the opinions of non-examining medical sources.  *See* 20 C.F.R. § 416.927(d)(1).  Still, the opinions of non-examining state agency medical consultants have some value , and under some circumstances, can be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p.  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians, including supportability, consistency and specialization. *See* 20 C.F.R. § 416.972(d), (f); *see also* Ruling 96-6p, at *2-*3.

2. <u>*Non-Treating Medical Sources*</u>

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180, at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*., at *2-*3.  The Regulations explain, "In deciding whether you are

13

disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §416.927(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 416.927(d), including, at a minium, the factors of supportability, consistency and specialization.  *See* 20 C.F.R. §416.972(f); *see also* Ruling 96-6p at *2-*3.

## C.  Analysis

The ALJ specifically found that the opinion of Dr. Thompson, Plaintiff's treating physician, was entitled to "only minimal weight."  (Tr. 23).  This Court's examination of that conclusion reveals both that it is supported by substantial evidence and that the ALJ applied the correct legal criteria.  ALJ McNichols first cited the lack of any treatment notes or objective tests accompanying Dr. Thompson's assessment which demonstrated that Plaintiff was able to perform only light level work.  (*Id*.).  The ALJ also observed that Dr. Thompson's conclusions in fact "specifically referenced prior . . . testing . . . which is clearly consistent with the ability to perform medium level work."  (*Id*.).  Indeed, Dr. Thompson herself noted that the test results so referenced by the ALJ were within normal limits.  (*See* Tr. 407, "WNL").

14

In addition, the ALJ found no evidence that Dr. Thompson provided any specific treatment directed to Plaintiff's COPD.  (Tr. 23).  Although Dr. Thompson prescribed Albuterol and Advair, she initially diagnosed Plaintiff's condition as asthma, for which such medications also would have been appropriate.  (*See* Tr. 448).   Her later COPD diagnosis notwithstanding (*see* Tr. 407), a treating physician's diagnosis is not by itself determinative of the ultimate disability determination.  *See Simons v. Barnhart*, 114 F. App'x 727, 733-34 (6th Cir. 2004); *see also Landsaw v. Sec'y of Health & Human Serv.*, 803 F.2d 211, 213 (6th Cir. 1986); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [a condition], of course, says nothing about the severity of the condition."); 20 C.F.R. § 416.927(e)(1).  The ALJ was influenced by Dr. Thompson's characterization of Plaintiff's status as "improving" with treatment (*see* Tr. 407), and by the possible effect of Plaintiff's continued smoking on his pulmonary symptoms.  (Tr. 23).  The ALJ thus reasonably concluded that Dr. Thompson's opinion alone would not be sufficient to establish disability, even in the absence of rebutting opinions.

The ALJ further concluded, however, that the objective findings of Dr. Padamadan, the examining physician, and the assessments of the state agency reviewing physicians of record, Drs. Freihofner and Pangalangan, were entitled

to "greater weight" than Dr. Thompson's opinion that Plaintiff was disabled.

(Tr. 23).  Generally, the more consistent an opinion is with the record as a whole,

the more weight that may be given to that opinion.  20 C.F.R. § 416.927(d)(4).

The examining and reviewing physicians' opinions were consistent with one

another, but not with the opinion of Dr. Thompson.  Additionally, more weight

generally is given to the opinion of a specialist about medical issues related to

his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d)(5).  There is no indication that Dr. Thompson was a

pulmonary specialist.  Accordingly, there is no basis for this Court to conclude

that the ALJ failed to apply the appropriate legal standards to Dr. Thompson's

opinion.  *See Wilson,* 378 F.3d at 544.

Plaintiff further argues that the ALJ erred by not finding him limited to

light work at age 60, and in turn, by not finding him to be disabled pursuant to

Grid Rule 202.01, Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix

2.  This argument lacks merit because the ALJ's assessment of Plaintiff's

residual functional capacity – at the limited range of medium work – was

supported by substantial evidence in the form of the opinions of Drs.

Padamadan, Freihofner and Pangalangan.  As a result, the ALJ also was not

required to apply Grid Rule 202.01, since it applies only to persons able to

16

perform only <u>light</u> work.  *See Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003)

(claimant's characteristics must exactly match the criteria in Grid Rules to trigger

a disability finding).

 Plaintiff further contends that proper evaluation of his COPD as

diagnosed by Dr. Thompson would have led to the conclusion that Plaintiff's

condition satisfied Listing 3.02, describing Chronic Pulmonary Deficiencies.  To

satisfy his burden at Step 3, however, a claimant must show that his impairment

meets <u>all</u> of the criteria in Listing 3.02.  *See Sullivan v. Zebley*, 493 U.S. 521, 531

(1990); *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004).  "An impairment that

manifests only some of those criteria, no matter how severely, does not qualify."

*Zebley*, 493 U.S. at 530.  Similarly, to show that he equals a listed impairment,

Plaintiff must "present medical findings equal in severity to *all* the criteria for

the one most similar listed impairment."  *Id.* at 531.  It is not enough for Plaintiff

to show that the overall functional impact of his impairment is as severe as that

of an impairment in the Listings.  *See id.*

 Given the potentially dispositive nature of the Listings, Plaintiff bore a

heavy burden of proof at Step 3.  The Supreme Court has explained as follows:

> The Secretary [now, the Commissioner] has set the
> medical criteria defining the listed impairments at a
> higher level than the statutory standard.  The listings
> define impairments that would prevent an adult

regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'. . .  The reason for this difference between the listings' level of severity and the statutory standard is that . . . the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

*Zebley*, 493 U.S. at 532 (internal citations omitted).

In considering whether Plaintiff's COPD was of listing level severity, the

ALJ determined as follows:

The claimant also has an extensive history of smoking-induced chronic obstructive pulmonary disease. Spirometric testing performed in February 2006 did show severely diminished FEVl functioning attributable to smoking-related obstructive changes. Bronchodilators and Nebulizer therapy were initially prescribed for the claimant.  Nighttime supplemental oxygen therapy was eventually prescribed, but treatment notes establish that there is no medical necessity for the daytime use of supplemental oxygen as the claimant sought to establish at the hearing. Notably, the claimant clearly attempted to magnify the severity of his respiratory complaints when he testified at the hearing, but his allegations that he requires constant use of supplemental oxygen are undermined by his continued smoking against medical advice. Despite such ongoing noncompliance, restrictions precluding the claimant from working in environments where he would be exposed to temperature extremes,

18

> excess humidity, or pulmonary irritants have been
> included in the residual functional capacity.  These
> restrictions fully accommodate the claimant's
> respiratory complaints.  There is no adequate
> evidentiary support for further restriction
> accommodating workplace use of supplemental
> oxygen.

(Tr. 23) (citations to record omitted).

As the Commissioner aptly argues, agency regulations require that testing being used to support the existence of a Listing 3.02 impairment contain "[a] statement . . . in the . . . test report of the individual's . . . effort and cooperation in performing the pulmonary function tests."  20 C.F.R. Pt. 404, Supbt P, App. 1, § 3.00 *Respiratory System*, ¶ E.  (*See* Doc. #10 at 7).  Although Plaintiff's February 2006 testing, as noted above, does show severely diminished FEV1 functioning, the administering physician specifically noted that the decreased post-bronchodilator result "most probably reflect[ed] diminished patient effort."  (*See* Tr. 504).  The physician reporting the DLCO results commented that "the data at this time cannot be fully validated."  (*Id*.).  Plaintiff bears the burden of proving that he medically equals a listing, yet the record contains no credible medical opinion or objective evidence showing that he does.  The Court therefore must reject Plaintiff's attack on the ALJ's decision.  *See Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986) ("Even in a close case in which the myriad medical problems

19

of the claimant are . . . evident . . ., the ALJ's findings of fact should not be disturbed unless we are persuaded that his findings are legally insufficient.").

A review of the ALJ's decision reveals that he considered the record as a whole and reasonably concluded that Plaintiff is restricted to performing a limited range of medium work, which excludes any work above shoulder level with his left upper extremity; climbing ladders, ropes and scaffolds; and otherwise working around hazards or in environments where he would be exposed to temperature extremes, excess humidity or pulmonary irritants.  (Tr. 21).  In so concluding, the ALJ properly considered the medical source opinions, the objective medical evidence, and other pertinent evidence.  *See* 20 C.F.R. § 416.945.

## IT THEREFORE IS RECOMMENDED THAT:

1. The Commissioner's non-disability finding be AFFIRMED; and

2. The case be TERMINATED on the docket of this Court.


June 1, 2010                                          s/Sharon L. Ovington
                                                      Sharon L. Ovington
                                              United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).

21